UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TOREY MICHAEL ADAMCIK,<br><br>　　　　　　Petitioner,<br><br>v.<br><br>WARDEN KEITH YORDY,<br><br>　　　　　　Respondent. | Case No. 1:18-cv-00015-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Idaho

prisoner Torey Michael Adamcik ("Torey" or "Adamcik"), challenging his Bannock

County conviction and fixed life sentence for first-degree murder.[1] Dkt. 1. The Petition is

now fully briefed and ripe for adjudication. *See* Dkt. 9, 13, 18. The Court takes judicial

notice of the records from Adamcik's state court proceedings, which have been lodged by

Respondent.[2] Dkt. 8, 17. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550,

551 n.1 (9th Cir. 2006).

All parties have consented to the jurisdiction of a United States Magistrate Judge

to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal

---

[1] Adamcik also was convicted of conspiracy to commit first-degree murder, but the Petition does not challenge that conviction or sentence.

[2] Respondent's lodging does not include pages 2239 to 2244 and 2269 to 2286 of the Reporter's Transcript, which are portions of Adamcik's cross-examination of Dr. Garrison on June 5, 2007 (day six of the trial). Having considered the remainder of the state court record, the Court has determined that reviewing those missing pages is not necessary to resolve the instant Petition.

Rule of Civil Procedure 73. *See* Dkt. 7. Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court will enter the following Order denying habeas corpus relief.

## BACKGROUND

Adamcik was sixteen years old when, on September 22, 2006, he and Brian Draper killed their friend and classmate, Cassie Jo Stoddart, in a quest to become famous serial killers. Adamcik and Draper were convicted, in separate trials, of first-degree murder and conspiracy to commit murder.

Pursuant to 28 U.S.C. § 2254(e)(1), the following facts of Adamcik's case, as described by the Idaho Supreme Court, are presumed correct absent clear and convincing evidence to the contrary:

> On September 22, 2006, Stoddart was spending the night at her cousin's house, the Whispering Cliffs residence, performing house-sitting duties. Matt Beckham (Beckham), Stoddart's boyfriend, stated that he and Stoddart had invited Adamcik to the Whispering Cliffs residence that evening to "hang out." Adamcik and Draper arrived at the Whispering Cliffs residence at approximately 6:30 or 7:00 PM. After spending approximately two hours at the Whispering Cliffs residence, Draper informed Stoddart and Beckham that he needed to leave and shortly thereafter Draper and Adamcik departed.
>
> Approximately fifteen minutes after Adamcik and Draper departed, the power at the Whispering Cliffs residence went out. Beckham called his mother to ask for permission to stay the night, but such permission was denied. After speaking with his mother, Beckham phoned Adamcik to inform him that Beckham would be going home for the night. Beckham later said that during their conversation Adamcik

spoke in a whisper and claimed to be at a movie. Beckham and Adamcik spent the following day together. Beckham tried repeatedly to call Stoddart throughout the day but was unable to get an answer.

On September 24, 2006, it was discovered that Stoddart had been killed at the Whispering Cliffs residence. Police officer Hatch responded to the scene and noted large amounts of blood on the victim's body, as well as deep lacerations and stab wounds. Shortly after responding, police and paramedics confirmed that Stoddart was dead. Detectives conducting the preliminary investigation determined that Adamcik and Draper had been among the last people to see Stoddart alive.

Detectives Thomas and Ganske went to the Adamcik home and interviewed Adamcik on September 24, 2006. Adamcik's father, Sean Adamcik (Sean), was present. This interview was the first of two interviews that detectives Thomas and Ganske conducted with Adamcik. During the course of the first interview, Adamcik informed the detectives that he and Draper had gone to the Whispering Cliffs residence at approximately 8:30 PM on September 22, 2006, for a party. Adamcik stated that when it became apparent that a party was not going to take place, he and Draper decided to go and see a movie in Pocatello. When the detectives questioned Adamcik regarding the movie he had reportedly seen, Adamcik was unable to describe what the movie had been about. Adamcik told detectives that following the movie he and Draper had gone to spend the night at Adamcik's home.

On September 27, 2006, after Adamcik's first interview, but before the second, Draper led law enforcement agents to a stash of evidence buried in the Black Rock Canyon area (BRC site). The evidence uncovered by law enforcement at the BRC site included:

1.     Two dagger-style knives with sheaths.

2.     A silver-and-black-handled knife with a smooth and non-serrated

       blade.

3.      A folding knife with a silver blade and black handle, which is similar

to a survival knife. The portion of the blade nearest to the hilt is

serrated.

4.      A homemade Sony videotape (BRC tape).

5.      A box of stick matches.

6.      A melted brown bottle of hydrogen peroxide.

7.      Partially burned notebook paper.

8.      A partially melted multi-colored mask.

9.      A red and white mask.

10.     A pair of black boots.

11.     A single black glove.

12.     A pair of black "Puma" gloves.

13.     A pair of blue latex gloves.

14.     A pair of fingerless black "Athletic Works" gloves.

15.     A black "Calvin Klein" dress shirt.

16.     A black "Hagger" shirt.

*State v. Adamcik*, 272 P.3d 417, 426 (Idaho 2012) (*Adamcik I*). Adamcik admitted that

his handwriting was on the notebook paper "found along with the other evidence at the

BRC site." *Id.*

The BRC tape found at the site consisted of "footage of Adamcik and Draper

planning Stoddart's murder, and later reacting to having killed Stoddart." *Id*. The seven

video clips, rearranged by the Idaho Supreme Court in chronological order, reveal the

following interactions between the two young men:

1. *September 21, 2006, at 8:05:23 PM* [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]

**Draper:** We're going for a high death count

**Adamcik:** Plus, we're not going to get caught Brian, if we're going for guns, we're just gonna end it. We're just gonna grab the guns and get outta there and kill everybody and leave.

**Draper:** We're going to make history.... We're gonna make history.

**Adamcik:** For all you FBI agents watching this-

**Draper:** (laughing)

**Adamcik:** Uh ... you weren't quick enough. (laughing)

**Draper:** You weren't quick enough, and you weren't s-s-smart enough. And we're going over to [Jane Doe 1's] house, we-we-we're going to snoop around over there and try to see if she's home alone or not, and if she's home alone, SPLAT! ... She dead.

**Adamcik:** Don't put your humor into this Brian.

**Draper:** Uh, I'm not putting any humor into it.... Yep, people will die, and m-m-memories will fade.

**Adamcik:** Memories will fade.... I, hmm, I wonder what movie you got that from Brian?

**Draper:** Myself!

**Adamcik:** (laughing)

**Draper:** That was from myself.

**Adamcik:** No wonder it was so lame.

**Draper:**—kay, we're on our way, and I'm gonna, I'll let you stay tuned, we're almost there.

2. *September 21, 2006, at 8:08:12 PM* [Adamcik and Draper are in a car, Draper is filming Adamcik with the camera light on]

**Draper:** We're at [Jane Doe 1's] house. It's clear out there in the pasture. We've already snooped around her house a couple times, Uh, and sh-sh-she's not at home so we're gonna go to that church over there and we're gonna call a girl and a guy named Cassie and Matt. They're our-our friends but we have to make sacrifices. So um I feel tonight i-i-it is the night and I feel really weird ... and stuff. I feel like I want to kill somebody. Uh, I know that's not normal but what the hell.

**Adamcik:** I feel we need to break away from normal life.

**Draper:** How bright is this light? [Draper has turned the camera light directly onto Adamcik]

**Adamcik:** Because ... let's put it this way ... parents, along with their parents, along with their parents, and so on—

**Draper:** Uh-huh

**Adamcik:**—taught them about God, Jesus, the whole bullshit—

**Draper:** (laughing)

**Adamcik:**—line. I'm sure you guys believe in God as well. I realized when I was in seventh grade ... along, you don't believe in Santa Claus or—

**Draper:** (laughing)

**Adamcik:**—vampires, or werewolves, they're used to metaphor, not let—they teach their kids back in the 1800s, I learned this in English class, about telling their kids that

they can't go outside or a vampire will get you—just to make their kids stay and do what they want to do. God is basically—

**Draper:** That's what God's for right?

**Adamcik:** —the same way—

**Draper:** Yep.

**Adamcik:** —tryin' to get people to do good, or else "so-called" [air quoting] you go to hell.

**Draper:** And we're obviously going to hell if it's real, but who gives a shit?

**Adamcik:** And why would you say it's real?

**Draper:** [talking over Adamcik] Yeah, but it's not real. It's not real, cuz it's so blatantly obvious that it's not real, but (laughing)

**Adamcik:** People believe it because their parents teach them, and so it's so hard for them to let go of it because they've been taught their whole life.

**Draper:** Yeah, I know.

**Adamcik:** But, fuckin—

**Draper:** What?

**Adamcik:** —the point I'm makin' is ... we are also taught that things like killing people and other things is wrong. The only thing that is wrong about is because it's breaking the law and the law is only wrong (mumbling, searching for words)—

**Draper:** Natural selection, dude. Natural selection, that's all I've gotta say.

**Adamcik:** There should be no law against killing people. I know it's a wrong thing, but ...

**Draper:** Natural selection—

**Adamcik:**—Hell, hell, you restrict somebody from it, they're just gonna want it more.

**Draper:** Exactly. Goodbye camera.

3. *September 21, 2006, at 8:15:39 PM* [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]

**Draper:**—home. My friend's too pussy to go investigate—turn here

**Adamcik:** Too smart—

**Draper:** Why aren't you turning there dude?

**Adamcik:** Cuz it's faster this way

**Draper:** Now we're going to go over to Cassie and Matt's house. If they're home alone, we're gonna ...

**Adamcik:** It's Cassie's house. Matt is there.

**Draper:** Matt is there. Sorry. We're gonna ga—we're gonna knock on the door. We'll see who is there. We'll, we'll see, we'll see-see if their parents are home or not. If they're home alone we will leave our way and then we will come back in about ten minutes. We'll sneak in through the door because chances are they're probably in Cassie's room. S–s–s–so we will sneak in the front door, we'll make a noise outside.

**Adamcik:** And Matt will come out to investigate.

**Draper:** We'll kill him. And we'll scare the shit out of Cassie ... okay?

**Adamcik:** Sounds like fun.

**Draper:** Well stay tuned.

4. *September 21, 2006, at 8:36:46 PM* [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]

**Draper:** We found our victim and sad as it may be she's our friend but you know what? We all have to make sacrifices. Our first victim is going to be Cassie Stoddart and her friends ...

**Adamcik:** [directed at passing car] God, turn your brights off asshole!

**Draper:** We'll let you ... (laughs) we'll find out if she has friends over, if she's going to be alone in a big dark house out in the middle of nowhere (laughs). How perfect can you get? I, I mean like holy shit dude.

**Adamcik:** I'm horny just thinking about it.

**Draper:** Hell yeah. So we're gonna fuckin' kill her and her friends and we're gonna keep moving on. I heard some news about [Jane Doe 2], she's gonna be home alone from six to seven so we might kill her and drive over to Cassie's thing and scare the shit out of them and kill them one by fucking one. Hell yeah.

**Adamcik:** Why one by one? Why can't it be a slaughterhouse?

**Draper:** Two by two and three by three. Cause we've got to keep it classy.

**Adamcik:** Keep it classy.

**Draper:** So yeah. It's going to be extra fun.

**Adamcik:** You're evil (laughs).

**Draper:** Yes, I am. So are you dude. Evil. Evil.

**Adamcik:** No. Evil is an expression of God. That was another test you failed.

**Draper:** Evil is not an expression of God.

**Adamcik:** Yes, it is.

**Draper:** That is bullshit and you know it.

**Adamcik:** Evil of origin is a follower of fucking Satan.

**Draper:** There is no Satan.

**Adamcik:** Is Satan real? Then shut up.

**Draper:** Then how are we supposed to express ourselves?

**Adamcik:** Good and Bad.

**Draper:** We're, we're bad.

**Adamcik:** We are bad.

**Draper:** That sounds so shitty.

**Adamcik:** We're evil. That sounds even shittier.

**Draper:** Hey, we're not, okay. Then we are sick psychopaths who get their pleasure off killing other people.

**Adamcik:** That sounds good baby.

**Draper:** We're gonna go down in history. We're gonna be just like Scream except real life terms.

**Adamcik:** That sounds good baby.

**Draper:** We're gonna be murderers. Like, let's see, Ted Bundy, like the Hillside Strangler.

**Adamcik:** No.

**Draper:** The Zodiac Killer.

**Adamcik:** Those people were more amateurs compared to what we are going to be, we're gonna be more of higher sources of Ed gl ...

**Draper:** Gein

**Adamcik:** Gein

**Draper:** (laughs) Well let's say we're that sick and that twisted—

**Adamcik:** Oh, you know what Ed Gein's words were?

**Draper:** What?

**Adamcik:** He saw a girl walkin' down the street, right?

**Draper:** Yeah.

**Adamcik:** Two questions came to his head. Hmm, I could take her out and have a nice time with her—

**Draper:**—and then kill her? Skin her alive?

**Adamcik:**—charm the pants off her. Or, I wonder what her head would look like on a stick? (laughs)

**Draper:** (laughs) Holy shit!

**Adamcik:** It's creepy huh?

**Draper:** Kick ass.

**Adamcik & Draper:** (laughing)

**Draper:** Murder is power, murder is freedom, goodbye.

**Adamcik:** Umm—

5. *September 22, 2006, at 12:10:58 PM* [Adamcik and Draper are sitting at a table with the camera facing them]

**Draper:** Alright, cool.

**Adamcik:** [looking down and writing in a notebook] I was planning to kill him.

**Draper:** September 22, 2006, we're skipping our fourth hour class. We're writing our plan right now for tonight. It's gonna be cool.

**Adamcik:** We? Torey and Brian ... [writing] ... we're making our death list right now, for when, for actually tonight ...

**Draper:** (whispering) she's watching us ...

**Adamcik:** (unintelligible)

**Draper:** She's still watching us ...

**Adamcik:** (mumbling, unintelligible)

**Draper:** [loudly] Number 2 is what?

[long gap where Adamcik and Draper are both concerned a teacher is going to see them, are whispering various things related to this and trying to make themselves less visible]

**Adamcik:** [writing again] Then ... (unintelligible)

**Draper:** Yeah, if you're watching this we're probably deceased

...

**Draper:** Hopefully this will go smoothly and we can get our first kill done and then keep going.

**Adamcik:** For you future serial killers watching this tape

**Adamcik & Draper:** (laughing)

**Adamcik:** I don't know what to say.

**Draper:** It–It's—

**Adamcik:**—good luck with that.

**Draper:** Good luck.

**Adamcik:** Hopefully you don't have like 8 or 9 failures like we have.

**Draper:** Yeah, we've probably tried maybe 10 times, but they've never been home alone so—

**Adamcik:** Or when they have, their parents show up.

**Draper:** As long as you're patient you know, and we were patient and now we're getting paid off, cuz our victim's home alone, so we got er, our plan all worked out now.... I'm sorry. I'm sorry Cassie's family, but she had to be the one. We have to stick with the plan ... and she's perfect, so she's gonna die (laughs)

...

6. *September 22, 2006, at 9:53:20 PM* [It is dark and Draper and Adamcik are sitting in a car.]

**Draper:** We're here in his car. The time is 9:50, September 22nd, 2006. Um ... unfortunately we have the grueling task of killing our two friends and they are right in—in that house just down the street.

**Adamcik:** We just talked to them. We were there for an hour, but ...

**Draper:** We checked out the whole house. We know there's lots of doors. There, there's lots of places to hide. Um, I unlocked the back doors. It's all unlocked. Now we just got to wait and um ... yep, we're, we're really nervous right now but, you know, we're ready.

**Adamcik:** We're listening to the greatest rock band ever.

**Draper:** We've waited for this for a long time.

**Adamcik:** Pink Floyd. Before we commit the ultimate crime of murder.

**Draper:** We've waited for this for a long time.

**Adamcik:** A long time.

**Draper:** We—well stay tuned.

7. *September 22, 2006, at 11:31:56 PM* [Adamcik and Draper are in a car driving.]

> **Draper:**—just killed Cassie! We just left her house. This is not a fucking joke.
>
> **Adamcik:** I'm shaking.
>
> **Draper:** I stabbed her in the throat, and I saw her lifeless body.
>
> It just disappeared. Dude, I just killed Cassie!
>
> **Adamcik:** Oh my God!
>
> **Draper:** Oh, oh fuck. That felt like it wasn't even real. I mean it went by so fast.
>
> **Adamcik:** Shut the fuck up. We gotta get our act straight.
>
> **Draper:** It's okay. Okay? We—we'll just buy movie tickets now.
>
> **Adamcik:** Okay
>
> **Draper:** (Unintelligible)
>
> **Adamcik:** No.
>
> **Draper:** Okay. Bye.

*Id.* at 427–30 (alterations in original).

Detectives Thomas and Ganske interviewed Adamcik again after the evidence was found at the BRC site:

> During the course of the interview, Adamcik informed detectives Ganske and Thomas that he and Draper had arrived at the Whispering Cliffs residence at 8:00 or 8:30, got a tour of the home, watched a portion of the film *Kill Bill Vol. 2*, departed from the Whispering Cliffs residence at approximately 10:00 PM, and began attempting to break into cars. Adamcik stated that during the course of their attempted

burglaries he made multiple calls to Beckham and during the final call Beckham informed Adamcik that his mother was coming to get him from the Whispering Cliffs residence.

Adamcik stated that he and Draper returned to Adamcik's house at around 11:30 PM and did not leave for the remainder of the night. However, when Ganske informed Adamcik that witnesses had seen him at the convenience store, Common Cents, Adamcik stated that he and Draper had gone to the store so that Draper could buy matches for Draper's cigarettes. Adamcik eventually admitted that he and Draper had gone to Black Rock Canyon. At the close of Adamcik's second interview, the detectives informed Adamcik of the evidence that they had discovered at the BRC site and pressured Adamcik to tell the truth. Adamcik responded by asking "Can I talk to an attorney?" The detectives stopped questioning Adamcik immediately, and exited the room, allowing Adamcik and his father, Sean, to converse in private in a different room. Following this private meeting, Adamcik, Sean and the detectives reconvened in the interview room where detectives proceeded to tell Adamcik that he was going to be arrested and informed Adamcik of the evidence they had gathered. In response to intervening questions from Sean, Adamcik made both verbal and nonverbal replies.

At trial, the jury heard extensive forensic testimony documenting and analyzing Stoddart's wounds. The medical examiner, Dr. Steve Skoumal, performed the autopsy on Stoddart on September 25, 2006. Dr. Skoumal determined that the cause of Stoddart's death was stab wounds to the trunk. In all, Dr. Skoumal documented thirty knife-related wounds on Stoddart's body, twelve of which were potentially fatal. The State also had forensic pathologist Dr. Charles Garrison examine Stoddart's body. Dr. Garrison testified "It's my opinion that there were at least two knives used, one of which was a non-serrated blade, and one of which was a serrated blade." In general, the majority of the potentially fatal wounds that Dr. Skoumal listed were inflicted with the serrated blade, however, wound number 1, which struck the right ventricle of Stoddart's heart, was inflicted by a non-serrated blade—consistent with Dr. Garrison's testimony—and was potentially fatal.

*Id.* at 430–31.

Adamcik's defense, as explained by counsel at trial, was that he thought he and Draper were making a movie, that he did not realize what Draper was actually doing, and that Draper alone killed Cassie. *See, e.g.,* State's Lodging A-6 at 1121; State's Lodging A-7 at 1986–87, 2391–96, 2401–16. In support of that defense, Adamcik relied in part on the lack of incriminating scientific evidence. Cassie's blood was found on one shirt, one knife (a black folding knife with a partially serrated blade),[3] one glove, and one mask found at the BRC site. Adamcik's DNA, from either saliva or skin, was found on the mask that did not test positive for Cassie's blood. The glove with Cassie's blood on it was a soccer glove, and Draper was a soccer player. Adamcik was excluded as a contributor of DNA found underneath Cassie's fingernails, on the glove, and on the shirt that also had Cassie's blood on it. *See* State's Lodging A-7 at 1667–70, 1896–97, 1972, 1977–84, 2344, 2346–49, 2366–67, 2374–79, 2384–87; A-8 at 2672–81.

The defense also relied on expert testimony from Dr. Edward Leis, a forensic pathologist. Dr. Leis believed that a single knife—one with a serrated blade—caused Cassie's injuries. State's Lodging A-8 at 2599, 2632–33, 2638–40, 2656–57. Dr. Leis testified he had "no doubt" that wound number 22 was inflicted by "a serrated knife blade similar to" the partially serrated knife found at the BRC site; he also testified that, after

---

[3] One of the knives with a non-serrated blade presumptively tested positive for something that might have been blood. However, no DNA profile could be found, and the substance on that knife was never determined to be blood. State's Lodging A-7 at 2307, 2326–27, 2372–73. It could have been a "number of different things," including plant material. *Id.* at 2373.

causing wound number 22, the serrated blade continued through Cassie's hand to inflict wound number 1. *Id*. at 2615, 2650-51. Dr. Leis also believed Dr. Garrison might have mixed up wound numbers 1 and 2. *Id*. at 2613–14.

Mark Klinger, a retired crime scene and fraud investigator, testified for the defense as well. Klinger believed, based on what he called a "single blood drop path" at the crime scene, that Cassie was murdered by a "single assailant" and that only one knife was used. *Id*. at 2718, 2724. Klinger acknowledged that he had never previously investigated a murder involving knives and that he was not trained in forensic science. *Id*. at 2721–24.

Adamcik's defense also took aim at the police investigation, including the crime scene investigation and the autopsy. The defense contended that the investigation was shoddy and that, once detectives found the videotape, they essentially stopped investigating.

The jury found Adamcik guilty.

At Adamcik's sentencing hearing,[4] neuropsychologist Dr. Mark Corgiat testified that Adamcik was immature for his age and "demonstrated a pattern of neurocognitive defects," such as "less than age appropriate things like judgment, impulse control, complex problem solving, et cetera." State's Lodging A-8 at 2904–05. Dr. Corgiat also stated that Adamcik was a low risk to reoffend, *id*. at 2914–19, and was not the "kind of individual who is at high risk of being involved in violent activity," *id*. at 2920.

---

[4] Adamcik and Draper had separate sentencing hearings at which evidence was presented, but the Court heard argument and pronounced the sentences in both cases at a consolidated hearing. *See* State's Lodging A-10.

A special education teacher testified that Adamcik had an Individualized Education Plan because of a learning disability, that he was a model student, and that he was not a leader. *Id.* at 2924–27. Another teacher testified that Adamcik was kind, cooperative, and respectful, that he never complained, and that he was "naive and very gullible and very trusting—too trusting." *Id.* at 2932–34. Adamcik's parents, siblings, other family members also testified at the sentencing hearing. *Id.* at 2940–3054; State's Lodging A-9 at 26–55.

Additional evidence was presented that Draper had been thinking about hurting or killing classmates for several years. State's Lodging A-9 at 7–26, 96–98. And Adamcik stated during his presentence interview that, when he and Draper went into the house that night, Adamcik believed they were just going to scare Cassie as a joke or a prank. State's Lodging A-11 (sealed).

Dr. Kenneth Lindsey conducted a psychological evaluation of Adamcik but did not testify at sentencing. Dr. Lindsey's report concluded that Adamcik was immature for his age, had only fair insight, and had somewhat disorganized thought processes. Dr. Lindsey also found that Adamcik suffered from depression and anxiety. *Id.*

The state presented evidence obtained from two computers from the Adamcik residence, evidence that was stored under Adamcik's username. This evidence included disturbing sexual images. State's Lodging A-9 at 56–87. Victim impact evidence was also admitted at the sentencing hearing. *Id.* at 100–15.

Adamcik and Draper each received a fixed life sentence—life imprisonment without the possibility of parole. The trial court later denied Adamcik's motion for reduction of sentence.

The Idaho Supreme Court affirmed Adamcik's convictions and sentence. As relevant to Adamcik's current habeas claims, the state supreme court held that there was sufficient evidence to support the conviction for first-degree murder. The court rejected Adamcik's argument that, to convicted him of murder, the prosecution was required to prove that Adamcik "inflicted *the* fatal stab wound." *Adamcik I*, 272 P.3d at 434 (emphasis added). Nonetheless, the court held that a rational jury could have found, beyond a reasonable doubt, that Adamcik stabbed Cassie at least once and that the resulting wound was fatal. *Id*. at 432–34. The court also concluded that (1) there is no distinction between principal liability and accomplice liability in Idaho, (2) being charged as a principal placed Adamcik on notice, by operation of state law, that he was also charged as an accomplice, and (3) whether or not Adamcik personally stabbed Cassie, a rational juror could have found Adamcik guilty under an accomplice liability theory. *Id*. at 434–36.

Several months later, the United States Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012). *Miller* held that the Eighth Amendment prohibits mandatory life-without-parole sentences for juvenile murderers. *Id*. at 479. Under *Miller*, sentencing judges must have discretion in imposing such a sentence, as the trial judge did when sentencing Adamcik.

Adamcik filed a post-conviction petition and raised a *Miller* claim, among others, alleging that his fixed life sentence violated the Eighth Amendment. State's Lodging C-1 at 48–66. The state district court dismissed the petition.

After the post-conviction court rejected Adamcik's *Miller* claim, the United States Supreme Court decided *Montgomery v. Louisiana*, 136 S. Ct. 718, 732 (2016), which held that *Miller* must be applied retroactively to cases on collateral review. The *Montgomery* Court also clarified that a *Miller* analysis includes both a procedural and a substantive component. The procedural component "requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id*. at 734. The substantive component of *Miller* holds that the Eighth Amendment prohibits a fixed life sentence for "juvenile offenders whose crimes reflect the transient immaturity of youth." *Id*.

Adamcik requested reconsideration of his *Miller* claim in light of *Montgomery*, but the state district court denied the request. The Idaho Supreme Court affirmed. That court acknowledged that, because the sentence was imposed before *Miller*, the sentencing judge did not use the precise language used in *Miller*. *Adamcik v. State*, 408 P.3d 474, 489–90 (Idaho 2017) (*Adamcik II*). However, the state supreme court reviewed the pre-*Miller* sentencing hearing and determined that (1) no such "talismanic language" was required, (2) the sentencing judge properly considered whether Adamcik was, in essence, irreparably corrupt, and (3) the sentencing judge appropriately imposed a fixed life

sentence after essentially finding that Adamcik's crimes "were not the product of youth's transient immaturity." *Id.*

In his federal Petition, Adamcik raises three claims. Claim 1 asserts that, under *Jackson v. Virginia*, 443 U.S. 307 (1979), there was insufficient evidence to convict Adamcik of first-degree murder. Dkt. 13 at 1. Claim 2 asserts that the Idaho Supreme Court violated Adamcik's due process rights by rejecting his *Jackson* claim "based upon an accomplice liability theory the state did not charge or argue and which the jury was not instructed upon."[5] *Id.* Finally, Claim 3 asserts that Adamcik's fixed life sentence violates the procedural and substantive Eighth Amendment requirements set forth in *Miller* and *Montgomery. Id.* at 1-2.

## HABEAS CORPUS STANDARD OF LAW

A federal court may grant habeas corpus relief when it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and

---

[5] Though Adamcik couches Claims 1 and 2 in terms of federal law, at times Adamcik's briefing appears to rely on the premise that, to convict Adamcik of murder, the jury was required to find, beyond a reasonable doubt, that Adamcik actually inflicted a potentially fatal stab wound; indeed, at times Adamcik's arguments also seem to rest on the premise that the jury was required to find that Adamcik inflicted *the* fatal stab wound, as he argued to the Idaho Supreme Court. To the extent Claims 1 and 2 challenge the Idaho Supreme Court's decision that first-degree murder does not require proof that the defendant's act was the sole cause of death or that the defendant actually inflicted "a" or "the" fatal injury, this Court cannot review that interpretation of Idaho state law. Nor can this Court reconsider the Idaho Supreme Court's conclusion that, under Idaho law, there is no distinction between principal and accomplice liability. These holdings are interpretations of Idaho state law by which this Court is bound. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Therefore, to the extent Adamcik bases Claims 1 and 2 on such arguments, the claims are subject to dismissal as noncognizable. Adamcik does not contest the noncognizability issue as to these aspects of Claims 1 and 2. *See* Dkt. 9, 13.

Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief

may be granted only where the state court's adjudication of the petitioner's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Deciding whether a state court's decision involved an

unreasonable application of federal law or was based on an unreasonable determination

of fact requires the federal habeas court to train its attention on the particular reasons—

both legal and factual—why state courts rejected a state prisoner's federal claims and to

give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92

(2018) (internal quotation marks and citations omitted).

When a party contests the state court's legal conclusions, including application of

the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests:

the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established

federal law "if the state court applies a rule different from the governing law set forth in

[the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court]

[has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694

(2002). Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If there is any possibility that fair-minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* To be entitled to habeas relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive

authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, evidence that was not presented to the state court cannot be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determinations of the state court were reasonable. *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2)."); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that the adjudication of a claim on the merits ... was based on an unreasonable determination of the facts, we evaluate the claim de novo, and we may consider evidence properly presented for the first time in federal court.").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have

reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). State court factual findings are presumed to be correct and are binding on the federal court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to, or an unreasonable application of Supreme Court precedent or by establishing that the state court's factual findings were unreasonable—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles*, 752 F.3d at 778. When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167-68. Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d at 1000.

Even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

## DISCUSSION

For the following reasons, the Court finds that the Idaho Supreme Court's resolution of Adamcik's habeas claims was reasonable under AEDPA.

## 1.     Claim 1: Sufficiency of the Evidence

In Claim 1, Adamcik contends that the evidence was insufficient to convict him of first-degree murder.

The Amended Information charged that Adamcik "did willfully, unlawfully, deliberately, with premeditation and with malice afore thought, kill and murder Cassie Stoddart, a human being, by purchasing knives and stabbing Cassie Stoddart from which the victim died in Bannock County, Idaho." State's Lodging A-3 at 719. Adamcik contends that this language charged him with "premeditated murder under a principal theory only."[6] Dkt. 13 at 2. Adamcik claims the evidence was not sufficient for the jury to conclude that Adamcik contributed to Cassie's death by stabbing her with a knife.

---

[6] As the Court explains below with respect to Claim 2, the Idaho Supreme Court disagreed. It interpreted the Amended Information as charging premeditated murder under both principal and accomplice liability

## A.     Clearly Established Law

The Fourteenth Amendment prohibits government action that deprives an individual of life, liberty, or property without due process of law. The Due Process Clause guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

When reviewing a sufficiency of the evidence claim, a court must determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id*. at 318. The question is not whether the reviewing court itself believes that the record evidence establishes proof of guilt beyond a reasonable doubt. "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

---

theories, because—by operation of state law—a charge of murder as a principal automatically places the defendant on notice that he is also charged with murder as an accomplice. *Adamcik I*, 272 P.3d at 435, 438. This Court cannot review that conclusion, as it is entirely dependent on an interpretation of Idaho state law. *See McGuire*, 502 U.S. at 67–68.

**B. State Court Decision**

The Idaho Supreme Court rejected Claim 1, concluding that a reasonable juror

could have found the following facts beyond a reasonable doubt:

> (1) two knives were used to murder Stoddart; (2) both knives
> inflicted potentially fatal wounds; (3) Draper favored the
> knife with the serrated blade which inflicted most of the
> potentially fatal wounds; and (4) the other knife was used by
> Adamcik to inflict the other stab wound that injured
> Stoddart's vital structures and which had the potential to be
> fatal.

*Adamcik I*, 272 P.3d at 433–34. In doing so, the state court relied on the following trial

evidence:

> Dr. Skoumal, the medical examiner who performed the
> autopsy on Stoddart, testified that Stoddart died from
> *multiple* stab wounds to the trunk. Dr. Skoumal also testified
> that twelve of the thirty knife-related wounds on Stoddart's
> body had the potential to be fatal. Of those twelve, Dr.
> Skoumal was unable to identify the specific wounds that
> caused Stoddart's death, but it is clear from his testimony that
> she died as a result of more than one of those twelve stab
> wounds. According to Dr. Skoumal, one of those wounds,
> referred to as wound number 1;
>
> > was located in Stoddart's mid, upper chest....
> >
> > The tissues that it penetrated included the skin,
> > muscle, soft tissue, right rib number three, the
> > mediastinum—which is in the middle of the
> > chest—the pericardial sac—which is the sac
> > overlining the heart—the right ventricle—which
> > is a part of the heart. And there were two cups
> > of blood in the pericardial sac surrounding the
> > heart.
> >
> > It's my opinion that the vital structures were
> > injured, and it had the potential to be fatal.
> > [quoting State's Lodging A-15 at 2086.]

In response to a subsequent question from the prosecutor, as to whether wound number 1 was "potentially fatal," Dr. Skoumal answered in the affirmative.

Dr. Garrison testified that at least two knives were used in the murder of Stoddart, one with a serrated blade, and another with a non-serrated blade. Dr. Garrison based this conclusion on the fact that some of the wounds contained excoriations and tears around their edges, which is consistent with the use of a knife with a serrated blade, while other wounds contained no such excoriations or tears, which is consistent with the use of a knife with a non-serrated blade. Dr. Garrison further testified that wound number 1 did not contain any irregular cuts, which would be expected if wound number 1 was inflicted by a knife with a non-serrated blade. From the testimony of these two witnesses, taken together, a reasonable jury could conclude that wound number 1, which was a potentially fatal wound, was inflicted by a knife with a non-serrated blade. Therefore, the jury could have reasonably concluded that two knives were used during the attack on Stoddart, and that both knives inflicted wounds that could have caused Stoddart's death.[7]

Adamcik's friend, Joe Lucero, testified that he bought four knives for Adamcik and Draper. Lucero said that he used $45 to pay for the knives—$40 from Draper and $5 from Adamcik. Lucero identified four of the State's exhibits as the knives he bought. One of the knives had a serrated blade; the

_____

[7] In a footnote, the Idaho Supreme Court acknowledged that, unlike Dr. Skoumal, "Dr. Garrison did not address the issue of whether wound number 1 caused Stoddart's death." *Adamcik I*, 272 P.3d at 433 n.5. The court went on, however, to explain how Dr. Garrison's testimony permitted a reasonable inference that, as Dr. Skoumal testified, wound number 1 was potentially fatal:

> Dr. Garrison … state[d] that some of the twelve potentially fatal wounds "were inflicted after circulation had ceased, and those were a less concern simply because they would not have been fatal at this point." In other words, if a wound did not produce significant bleeding, it may have been inflicted after Stoddart's heart stopped pumping. Dr. Garrison did not rule out wound number 1 as a potentially fatal wound, nor did he address Dr. Skoumal's testimony which associated wound number 1 with two cups of blood in the pericardial sac surrounding the heart.

*Id.* at 433 n.5.

other three knives were non-serrated. Police found all four knives at the BRC site. Lucero testified that Draper made a point to claim ownership of the serrated knife. [*See* State's Lodging A-7 at 2023 (Lucero answering "Yes" to the question, "And isn't it true that [Draper] said, 'I paid for that knife—I get to keep it'?").]

The jury was presented with evidence that two knives inflicted potentially fatal wounds, and that Adamcik and Draper collaborated in the murder. This collaboration is supported by the BRC tape wherein Draper and Adamcik discuss their joint plan to kill Stoddart. The jury was also provided with evidence suggesting that Adamcik and Draper were together immediately after Stoddart's murder, and jointly attempted to hide weapons and clothing used during the commission of the murder. The jury watched the video of police interviewing Adamcik, during which Adamcik made verbal and nonverbal assertions that can reasonably be construed as his confessing to stabbing Stoddart.[8]

*Id.* at 433.

The state court determined that, based on this record evidence, a rational juror could have found, beyond a reasonable doubt, that (1) Adamcik used a knife with a non-serrated blade to inflict wound number 1 and (2) wound number 1 was a fatal wound. *Id.*

---

[8] Adamcik does not contest the Idaho Supreme Court's conclusion that Adamcik's statements to his father during his interview with police reasonably could be construed as confessing to stabbing Cassie. The Court has reviewed Adamcik's police interview and agrees. Adamcik's nod and his affirmative statement—directed toward his father at the end of the interview, after the detective explained the evidence against Adamcik—neither compel nor prohibit that construction. *See* State's Exhibit 12, part 2, at 3:00 to 3:20; *see also* State's Lodging A-6 at 1106 (prosecutor's opening statement fairly paraphrasing the interview as follows: "'*We have the knife you used; we have the mask you used; and we have the videotape.*' The defendant's father then asks ... '*This is right, Torey*?' And the defendant responds, '*Yeah.*' This defendant's father asks him, '*What they are saying is true*?' *And the defendant shakes his head affirmatively.*") (emphasis added). Thus, it was not unreasonable to find that Adamcik confessed to stabbing Cassie.

### C.    Adamcik Is Not Entitled to Relief on Claim 1

Adamcik challenges the Idaho Supreme Court's conclusion that there was sufficient evidence from which a jury could conclude beyond a reasonable doubt that Adamcik "inflicted at least one of the potentially fatal wounds." Dkt. 13 at 6. In doing so, Adamcik does not contend that, under § 2254(d)(1), the Idaho Supreme Court's resolution of Claim 1 was contrary to, or an unreasonable application of, *Jackson v. Virginia*. Rather, Petitioner acknowledges that the state supreme court implicitly found, as a factual matter, that Adamcik personally inflicted at least one of the potentially fatal wounds.[9] Adamcik contends this factual finding was unreasonable under § 2254(d)(2). Dkt. 13 at 2-9.

The Court disagrees. Adamcik's arguments challenging the state court's factual findings are excellent arguments—for a jury. But AEDPA requires more. The state court found that the jurors reasonably could have concluded that Adamcik inflicted wound number 1, a potentially fatal wound, with one of the non-serrated knives found at the BRC site. As explained below, this finding was reasonable.

Adamcik is correct that Dr. Garrison did not specifically testify that wound number 1 was inflicted with a non-serrated blade. However, the jury was informed about the differences between wounds with serrated markings and wounds with smooth

---

[9] The Idaho Supreme Court disclaimed any "independent finding of fact." *Adamcik I*, 272 P.3d at 439. But no matter how one describes that court's statements as to what a reasonable juror could find—as the court's independent factual finding or as a conclusion that the *jury* found that Adamcik personally stabbed Cassie and caused wound number 1—this Court is left with a factual finding that Adamcik, himself, inflicted a potentially fatal wound.

markings, and Dr. Garrison contrasted wound number 19—which had characteristics of both serrated and non-serrated blades—with wound number 1 as follows:

>Yes, if we look at [wound number 19], this is a nice smooth edge up here. It's hard to tell whether this is sharp or not simply because it's not a closed wound.

>And as we look down here, again, we see some irregularity, but can we unequivocally call it? No. We can suspect it, but we cannot call it. And the reason we suspect it, too, is because of this marking here, which then would be consistent with the serrations on the actual blade.

>So can I say this is a blade related to the serrated blade? Not to a reasonable medical certainty, no I could not.

>Now, if we take wound number "1" in the chest and wound number "1" is in the right side of the chest just above the right breast, and if we look here we see a nice—little tail where the blade tip scratched as it went out.

>We can see a nice sharp edge here, and we see— although this picture is somewhat out of focus, you can see it's fairly rounded here—and another impact injury….

>Wound number "1" and, again, we can see the sharp edge right here, and this is a slightly different angle. So I think you can appreciate the fact that there are no irregularities there. This is a smoothe [sic] edge.

State's Lodging A-7 at 2219–20.

As can be seen from this testimony, Dr. Garrison told the jury that wound number 19 may have been caused by a serrated blade because of the "irregularity" of the wound, and then immediately testified that wound number 1 had a smooth edge and contained no "irregularities." This was sufficient evidence for a reasonable juror to conclude that wound number 1 was caused by a knife with a non-serrated blade.

Adamcik also relies on Dr. Leis's testimony. Adamcik correctly notes that, based on this testimony, a rational juror *could* have inferred that wound number 1 was caused by a serrated blade instead of a non-serrated blade. But, as appropriately recognized by the Idaho Supreme Court, it was not permitted to "second-guess the jury by reweighing the evidence." *Adamcik I*, 272 P.3d at 432 n.4. Based on Dr. Skoumal's testimony, Dr. Garrison's testimony, and Joe Lucero's testimony regarding Draper's claim of ownership of the knife with a partially serrated blade, a rational juror *also* could have inferred (1) that wound number 1 was caused by a *non*-serrated blade, (2) that wound number 1 was one of the fatal wounds, and (3) that Adamcik wielded the non-serrated blade. And although the presence of Cassie's blood on only one of the knives, shirts, gloves, and masks found at the BRC site could have led the jury to conclude that only one person stabbed Cassie, it certainly does not compel that conclusion—especially given that (1) Adamcik and Draper poured chemicals on and burned some of the items at the BRC site, thereby potentially destroying other scientific evidence, and (2) Adamcik acknowledged to his father during a police interview that he had used a knife to kill Cassie.

With the heavy deference owed to the Idaho Supreme Court, the Court cannot say that its decision was based on an unreasonable factual finding under § 2254(d)(2). Therefore, sufficient evidence supports the first-degree murder conviction, and the Court will deny Claim 1.

## 2.  Claim 2: Principal versus Accomplice Liability

As noted previously, Adamcik contends that the Amended Information charged him with "premeditated murder under a principal theory only." Dkt. 13 at 2. Based on that premise, Claim 2 asserts that the Idaho Supreme Court affirmed his conviction on an accomplice liability theory that was not charged. This Court is bound by the Idaho Supreme Court's interpretations of Idaho law—(1) that there is no distinction between principal and accomplice liability in Idaho; (2) that, therefore, the Amended Information automatically charged Adamcik with murder under an accomplice liability theory; and (3) that Adamcik was placed on notice of that theory by operation of law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). As a result, this portion of Claim 2 is noncognizable.

However, Claim 2 also asserts that, even though Adamcik implicitly *was* charged on an accomplice liability theory, that theory was not argued to the jury, nor was the jury instructed on accomplice liability. Therefore, Adamcik contends, the Idaho Supreme Court's affirmance based on the accomplice liability theory violates due process.

### A.  *Clearly Established Law*

"Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused," *Dunn v. United States*, 442 U.S. 100, 106 (1979), and due process requires that an accused have "notice of the specific charge" against him, as well as "a chance to be heard in a trial of the issues

raised by that charge," *Cole v. State of Arkansas*, 333 U.S. 196, 201 (1948). Therefore, the Constitution prohibits an appellate court from affirming a conviction "on legal and factual grounds that were never submitted to the jury." *McCormick v. United States*, 500 U.S. 257, 269 (1991); *see also Dunn*, 442 U.S. at 100 (stating that a court may not "uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury").

*McCormick* was a corruption case under the Hobbs Act in which the jury was instructed that, to convict the defendant of extorting payment "under color of official right," the government had to prove that the defendant induced a cash payment. *Id.* at 261. The jury was not instructed that the government had to prove a quid pro quo. On appeal from the conviction, the Fourth Circuit affirmed, holding that the government was not required to prove a quid pro quo if the parties never intended a legitimate campaign contribution. In doing so, the appellate court articulated a seven-factor test, found sufficient evidence in the record that the parties did not intend a legitimate contribution, and thus held that proof of a quid pro quo was not required. *Id.* at 266.

The Supreme Court reversed. Even if the appellate court was correct in its articulation of the law, to affirm the conviction on that basis—which required factual findings as to intent that the jury was not asked to consider—violated the defendant's right to due process:

> [W]e are quite sure that the Court of Appeals affirmed the conviction on legal and factual grounds that were never submitted to the jury…. [T]he Court of Appeals' opinion did not examine or mention the instructions given by the trial

court…. Neither did the Court of Appeals note that the jury was not instructed in accordance with the court's holding that the difference between legitimate and illegitimate campaign contributions was to be determined by the intention of the parties after considering specified factors. Instead, the Court of Appeals, after announcing a rule of law for determining when payments are made under color of official right, went on to find sufficient evidence in the record to support findings … that the parties never intended any of the payments to be a campaign contribution.

It goes without saying that matters of intent are for the jury to consider. It is also plain that each of the seven factors that the Court of Appeals thought should be considered in determining the parties' intent presents an issue of historical fact. Thus even assuming the Court of Appeals was correct on the law, the conviction should not have been affirmed on that basis but should have been set aside and a new trial ordered.

*Id*. at 271–72 (internal citations and footnote omitted).

In *Dunn v. United States*, the defendant was charged with making false declarations on a specific date: September 30, 1976. However, the appellate court affirmed the conviction based on the defendant's statements on a different date: October 21, 1976. The Supreme Court reversed, holding that the court of appeals improperly upheld the conviction "on a charge that was neither alleged in an indictment nor presented to [the] jury at trial." 442 U.S. at 106. Even though the jury "might well have reached the same verdict had the prosecution built its case on [the defendant's] October 21 testimony … the offense was not so defined":

Appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial…. "[I]t is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."

442 U.S. at 106–07 (quoting *Cole*, 333 U.S. at 201). The court of appeals had violated

due process by affirming the convicted on a factual basis that was never charged or

presented at trial.

### B. *State Court Decision*

On direct appeal, Adamcik argued that the Idaho Supreme Court could not affirm

on an accomplice liability theory because to do so would violate due process. Addressing

this argument, the Idaho Supreme Court discussed *McCormick* and *Dunn*, along with a

Fifth Circuit case. The state court concluded that, "where the State has charged the

defendant in a general indictment, and an appellate court can affirm a defendant's

conviction under the same law as the trial court, there is no due process issue." *Adamcik*

*I*, 272 P.3d at 438. Relying on Idaho state law for the proposition that Adamcik's

charging document included both principal and accomplice liability theories, the court

distinguished *McCormick* and *Dunn* and rejected Adamcik's argument:

> Here, unlike *Dunn* and *McCormick,* there are not multiple
> charges or distinct facts the jury did not consider; the
> information charged Adamcik with murder and the jury
> considered all the evidence we now discuss. There is no
> distinction between principals and accomplices in Idaho, so
> the information charging murder put Adamcik on notice of
> both theories. The jury need not find separate facts, nor
> consider distinct elements of a crime to convict for murder as
> a principal or as an accomplice because both theories support
> the crime. So, unlike *McCormick,* we are not making an
> independent finding of fact. And, unlike *Dunn,* this case
> involved a generalized information, supporting either the
> principal or accomplice theory.

*Id.*

### C.    Adamcik Is Not Entitled to Relief on Claim 2

As an initial matter, the necessary premise of Claim 2—that the Idaho Supreme Court affirmed Adamcik's first-degree murder conviction based on an accomplice liability theory—ignores an essential fact. The Idaho Supreme Court affirmed, not only because Adamcik was liable as an accomplice, but *also* because the jury found, beyond a reasonable doubt, that he acted *as a principal. Compare Adamcik I*, 272 P.3d at 434 ("To be found guilty of murder, it was not necessary for Adamcik to have inflicted the fatal wound. It was only necessary to show that he aided and abetted in its commission."); *with id*. at 433–34 ("This evidence, coupled with the testimony provided by the State's experts, is sufficient for a reasonable jury to conclude that … *the other knife was used by Adamcik to inflict the other stab wound that injured Stoddart's vital structures and which had the potential to be fatal*.") (emphasis added).

As explained previously with respect to Claim 1, the finding that Adamcik himself used a knife to inflict a potentially fatal wound is reasonable. The state court explained the state's entire theory of the case as follows: "that Adamcik and Draper acted in concert to murder Stoddart: that Adamcik planned the murder; that he lay in wait with Draper to help carry out the murder; *and that he inflicted at least one stab wound that could have killed Stoddart*." *Id.* at 446 (emphasis added). Because the Idaho Supreme Court held that the State proved this theory beyond a reasonable doubt, that court's alternative ruling— that the jury reasonably could have found that Adamcik aided and abetted Draper in committing the murder—is beside the point.

Moreover, even if it ignored the finding that Adamcik directly inflicted wound number 1, this Court would conclude that the Idaho Supreme Court did not unreasonably apply *McCormick* and *Dunn*. Neither case involved a question of principal versus accomplice liability. The same is true with respect to *Cole v. Arkansas*, in which the intermediate appellate court had affirmed based on a different statutory section from that under which the defendants were charged and tried. 333 U.S. at 200–01. Therefore, it cannot be said that the Idaho Supreme Court's rejection of Claim 2 violated clearly established Supreme Court precedent as required by 28 U.S.C. § 2254(d)(1).

For the foregoing reasons, the Court will deny Claim 2.

**3.      Claim 3: Adamcik's Fixed Life Sentence**

In Claim 3, Adamcik asserts that his fixed life sentence for first-degree murder violates both the procedural and substantive components of *Miller* and *Montgomery*.

*A.      Clearly Established Law*

The Eighth Amendment prohibits cruel and unusual punishment. This prohibition "guarantees individuals the right not to be subjected to excessive sanctions"—a right which "flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller*, 567 U.S. at 469 (internal quotation marks omitted). A sentence that is within the statutory maximum penalty for the offense does not violate the Eighth Amendment unless the sentence is "grossly disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 60 (2010) (internal quotation marks omitted).

With respect to individuals who were juveniles at the time they committed their crimes, the Eighth Amendment imposes additional restrictions. Juvenile offenders may not receive the death penalty, *Roper v. Simmons*, 543 U.S. 551, 578 (2005), nor may they be sentenced to life without the possibility parole for non-homicide crimes, *Graham*, 560 U.S. at 82. And, as explained above, *Miller* and *Montgomery* "establish[] that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth'" and "require a sentencer to consider a juvenile offender's youth before imposing life without parole" on juvenile killers. *Montgomery*, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 472). The Eighth Amendment prohibits fixed life sentences for juvenile murderers "whose crimes reflect the transient immaturity of youth"; such a sentence must be reserved only for "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* (internal quotation marks omitted).

### B.    *State Court Decision*

The Idaho Supreme Court rejected Adamcik's *Miller* claim, holding that the sentencing judge satisfied the procedural aspect of *Miller* by considering and discussing Adamcik's youth "throughout the colloquy." *Adamcik II*, 708 P.3d at 489. The state supreme court found that the sentencing judge "specifically took Adamcik's youth—and its attendant characteristics—into account and determined that Adamcik's crimes were not the result of transient immaturity and that he would likely kill again if released from prison":

> The record contains ample evidence regarding Adamcik's youth and its attendant characteristics. Two different psychologists offered evidence of Adamcik's youth and

immaturity. The Presentence Investigation Report included a pre-trial psychological report from one of those psychologists, Kenneth P. Lindsey, Ph.D. In his report, Dr. Lindsey noted Adamcik's immaturity, disorganized thought processes, spontaneity, and inability to appreciate the gravity of his situation.

The other psychologist, Dr. Mark Corgiat, Ph.D, testified at Adamcik's sentencing hearing. He testified that adolescent brains are not fully developed—which usually takes males until their mid-twenties—and that the average adolescent "possesses less than adult capabilities in planning, reasoning, and judgment." He opined that Adamcik was immature even for his age, and that he "demonstrated a pattern of neurocognitive difficulties that indicated less than age-appropriate judgment, impulse control, and complex problem solving abilities." He also presented his history of ADHD and Adamcik's Individual Education Plan from school as tending to demonstrate frontal lobe immaturity.

The sentencing judge considered this evidence, in addition to other mitigating evidence, in reaching his decision. The sentencing judge directed the following at Adamcik early in his colloquy:

> Mr. Adamcik, I believe pretty much on this, you're an entirely different individual than portrayed by your family and friends. You do have ADHD, the frontal lobe of your brain not being fully developed due to your age.... They say you have knowledge within normal limits, but your processing is below normal.

The sentencing judge discussed Adamcik's youth throughout the colloquy, interspersed with the facts surrounding the crime. The sentencing judge noted Adamcik's cool-headedness in the wake of the killing while Draper, his co-defendant, exclaimed his excitement, and that the pair "methodically and intelligently planned to murder." The judge concluded that despite Adamcik's youth, this crime was the type of rare "barbarous, coldblooded horrific act" that justified the punishment. The sentencing judge stated, "[B]ased on all the evidence and all that I've read, I'm

> convinced beyond a reasonable doubt that if you two, or
> either one of you, were released that you will kill again."
> Later, during a Rule 35 hearing to consider a reduction of
> sentence, the sentencing judge, referring only to Adamcik,
> stated: "I took everything into consideration at sentencing.
> And I'm not unmindful of how young Torey is—and he was
> at the time he killed Cassie. I'm not unmindful of Dr.
> Corgiat's testimony and all the other testimony we have had
> at the sentencing." It is evident that the sentencing judge here
> took everything into account when making the decision to
> impose a life sentence, including ample psychological
> testimony that Adamcik's youth was a substantial factor in his
> crimes. This complies with *Miller*'s mandate.

*Id*. at 487–89 (alterations in original).

As for the substantive aspect of *Miller/Montgomery*, the state court upheld the
sentencing judge's finding that Adamcik was one of the rare juveniles for whom a fixed
life sentence is appropriate. *Id*. at 490. Specifically, the court found that "[t]he sentencing
judge's conviction that Adamcik would kill again if released is the quintessence of
finding him irreparably corrupt, and that [Adamcik's] actions were not the product of
youth's transient immaturity." *Id*. The Idaho Supreme Court agreed with the lower post-
conviction court's conclusion that "the sentencing judge—without using the term
'irreparably corrupt'—concluded Adamcik was exactly that." *Id*. Finding no violation of
*Miller/Montgomery*, the Idaho Supreme Court affirmed Adamcik's fixed life sentence.

### C. **Adamcik Is Not Entitled to Relief on Claim 3**

i. <u>The State Court Reasonably Held that Adamcik's Sentence Did Not
Violate the Procedural Component of *Miller/Montgomery*</u>

Adamcik first argues that the Idaho Supreme Court was prohibited from
undertaking a retroactive review of the sentencing hearing to determine whether that

hearing complied with *Miller* and *Montgomery*. Adamcik contends that where, as here, a juvenile fixed life sentence was imposed pre-*Miller*, the defendant must receive a new sentencing hearing. Dkt. 13 at 16–17.

The Court has found no United States Supreme Court precedent holding that a new sentencing hearing is required in every case where a juvenile defendant received a fixed life sentence before *Miller* was issued. Further, the Supreme Court itself has stated that "*Miller* did not impose a formal factfinding requirement." *Montgomery*, 136 S. Ct. at 735. Therefore, it was not unreasonable for the Idaho Supreme Court to conclude that it was permitted to conduct a retroactive sentencing review of the pre-*Miller* sentencing hearing to consider whether Adamcik's sentence violates the Eighth Amendment. *See* 28 U.S.C. § 2254(d)(1).

Adamcik next argues that the sentencing judge did not consider Adamcik's youth to the extent required by *Miller* and *Montgomery*, and that, therefore, Adamcik's sentencing hearing violated the procedural component of those cases. The Idaho Supreme Court reasonably rejected this argument because the sentencing judge did, indeed, consider Adamcik's youth. Even so, that judge determined that Adamcik's youth did not require a sentence permitting parole:

> And, Mr. Adamcik, I believe pretty much on this, you're an entirely different individual than portrayed by your family and friends. *You do have ADHD, the frontal lobe of your brain not being fully developed due to your age*…. They say you have knowledge within normal limits, but *your processing is below normal.*
>
> …

Dr. Garrison said there were two knives used in killing Cassie Jo, in his opinion. On the video after the killing, when Mr. Draper was exclaiming his—I don't know how else to put it—his excitement and pleasure at just killing Cassie, *you said, Shut the F up. We've got to get our act together. You didn't say, Why did you kill Cassie? I thought it was a joke.*

This is—this is an awful, awful situation, kids killing another kid. And it just—*you were all 16 when this happened and you two are 17 and Cassie, of course, is dead. Teenage killers perhaps should receive no mercy. I don't know.*

… *[T]he nature of the offense here you've both committed is, of course, the most serious we have in our society.* There has to be punishment to deter both of you from doing this again and perhaps deter others from doing this. I have to consider protection of society, which I'm considering very heavily here. And I suppose rehabilitation comes into this.

… You two have—you've ruined your lives. You've taken Cassie's life from her family, and you are so young. *That's what makes it awful for me, to sentence two kids. That's what you are, you're kids. And—but you've committed—both committed the ultimate offense in our society.*

… You both methodically and intelligently planned to murder Cassie Stoddart.

This was not a joke. I'm convinced *neither one of you thought it was a joke. You put your masks on, you took your real knives, you went back to the house with the definite intention of killing her, which you did. You both wanted to be famous as killers.*

…

You both have been convicted of murder in the first degree, and it's clear to the Court and the evidence at the trials, *Cassie was savagely stabbed many times. The horror, fright and pain she surely encountered before death was certainly immense. You disguised yourselves with masks in*

*the darkness, which made it more frightening for her. You both were excited after the murder about the killing, and you both attempted to destroy the evidence initially. The killing was a barbarous, cold-blooded horrific act.*

You both unequivocally changed the lives of the Stoddart family and your own families. If Cassie were able to speak today, I doubt very much that she would forgive either one of you. *You both have forfeited your privilege to live in a free society, and based on all the evidence and all that I've read, I'm convinced beyond a reasonable doubt that if you two, or either one of you, were released, that you would kill again. I'm convinced of that beyond a reasonable doubt.* I'm going to remand you both to the custody of the Bannock County Sheriff to be delivered to the Idaho State Correctional Institution where you will each serve a life sentence that is fixed without the possibility of parole.

*I'm not unmindful of how young you fellows are, but you commit a crime of this nature, and it's got to be—it's got to be known, not only by those who commit it, but to others in the community that the punishment will not—will not be so merciful. There's no mercy. Guys, I'm sorry. Guys, like I said, you guys are kids, but I just feel like this is a just sentence, given all the evidence that I had to look at.* So I—I'm sorry. I hope you two can have some kind of a life in the state correctional facility. At least it's more than Cassie has.

State's Lodging A-10 at 55–59 (emphasis added).

In denying Adamcik's Rule 35 motion for reduction of sentence, the trial court

reiterated that it had indeed considered Adamcik's youth in determining the sentence:

I have given this sentence more thought than anyone would believe before it was imposed and since you have filed your Rule 35 motion.

…

This case is such a terrible tragedy for everyone connected with it. The stress on this Court—it's my job—has

been horrendous. I'm sure on [counsel]—we all have to do our jobs the best way we can.

It's a terrible tragedy for the families involved here, Torey's family. Even more so for Cassie Stoddart and her family. But we're here because Mr. Adamcik willfully and deliberately conspired to kill Cassie, and he did kill her. Every time a knife entered Cassie's body, she certainly was afraid and in pain until her life bled from her, and this is just unconscionable conduct.

Mr. Adamcik—he can eat and he can read books, and he can exercise, and he can smell the fresh air and, of course, Cassie is gone from this life and gone from her family.

*I took everything into consideration at sentencing, and I'm not unmindful of how young Torey is—and was at the time he killed Cassie. I'm not unmindful of Dr. Corgiat's testimony and all the other testimony we have had at the sentencing.*

*In our society, at least in my opinion, when someone engages in this type of conduct, they should be punished as severe as the law allows.* There is no justification, no excuse, that condones this type of conduct.

*Mr. Adamcik wore a mask, Cassie was alone in the dark, and when the knives were going in and out of her body, it just had to be horrible for her. And I believe the sentence this Court imposed was a righteous sentence given the conduct*, and I don't believe Mr. Adamcik should be ever released from prison….

State's Lodging A-8 at 3109–11 (emphasis added).

Adamcik points to the sentencing court's statements about the ultimate offense in our society and about teenage killers perhaps receiving no mercy as evidence that the court relied almost exclusively on the nature of the first-degree murder charge, rather than considering Adamcik's youth and its attendant characteristics as required by

*Miller/Montgomery*. However, from the entirety of the judge's remarks, it is clear that the judge was not focusing simply on the fact of *a* murder, but the facts of *this* murder. Nothing in *Miller* or *Montgomery* prohibits a sentencing court from considering the facts of the crime in determining the sentence for a juvenile murderer—in fact, one can easily conclude from those opinions that judges are *required* to do so. How is a judge supposed to determine whether the crime reflects "irreparable corruption" versus "transient immaturity," if the judge does not actually consider the facts of that crime?

The trial judge stated that he considered all of the evidence presented, both in documentary form and at the sentencing hearing. The judge considered the fact that Adamcik had ADHD, that his brain was not fully developed "due to [his] age," and that his processing was "below normal." State's Lodging A-10 at 55. The judge was "not unmindful" of Adamcik's youth or of Dr. Corgiat's testimony. *Id*. at 59; State's Lodging A-8 at 3110. That testimony was that Adamcik was immature, lacked the "drive" to murder, was a low risk to reoffend, and could be rehabilitated. State's Lodging A-8 at 2913–15. Nonetheless, the sentencing judge found that the particular facts of this deliberate, premeditated, horrific and brutal murder justified the sentence imposed. The Idaho Supreme Court reasonably applied *Miller* and *Montgomery* in concluding that Adamcik's sentencing satisfied the procedural requirements of the Eighth Amendment as set forth in those cases.

If this Court were considering the issue de novo, the Court might have come to a different result, considering the recent Ninth Circuit case of *United States v. Briones*, 929

F.3d 1057 (9th Cir. 2019). In *Briones*, the sentencing judge clearly considered the juvenile defendant's age before imposing a sentence of life without parole, stating, "*in mitigation I do consider* the history of the abusive father, *the defendant's youth, immaturity, his adolescent brain at the time*, and the fact that it was impacted by regular and constant abuse of alcohol and other drugs, and he's been a model inmate up to now." *Id*. at 1062 (emphasis added). However, the Ninth Circuit determined that mere consideration of youth was not enough to comply with the procedural mandate of *Miller/Montgomery*. *Id*. at 1064. Instead, "when courts consider *Miller*'s central inquiry, they must reorient the sentencing analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history" or the severity of the defendant's crime. *Id*. at 1065–66.

The *Briones* court remanded because it could not "tell whether the district court appropriately considered the relevant evidence of Briones's youth or the evidence of his post-incarceration efforts at rehabilitation," given that the sentencing judge's statements were brief—consisting of two pages of transcript—and the comments about the defendant's youth very generalized. *Id*. at 1066. After *Briones*, federal district courts in the Ninth Circuit must thoroughly and explicitly examine all of a juvenile killer's youthful characteristics in a forward-looking assessment, and in more than a summary manner, before imposing a fixed life sentence.

Adamcik's sentencing judge was much more thorough than the judge in *Briones*, discussing Adamcik's youth and attendant characteristics several times. The judge did, however, appear to emphasize the particular facts of the murder—"a backward-focused review"—more so than Adamcik's youthful characteristics and his capacity to change in the future. Thus, if *Briones* applied here, this Court might conclude that Adamcik's sentencing did not comply with the procedural requirements of *Miller* and *Montgomery*.

However, under AEDPA the critical inquiry is whether, at the time the Idaho Supreme Court affirmed Adamcik's fixed life sentence, United States Supreme Court precedent clearly established that what the sentencing judge did here was insufficient. It did not. Rather, *Miller* and *Montgomery* clearly establish only that (1) a sentencing judge must consider a juvenile murderer's youth and its attendant characteristics before imposing a fixed life sentence, and (2) such a sentence for a juvenile murderer is unconstitutional for all but the rare offender whose crime reflects irreparable corruption.[10] The sentencing judge in Adamcik's case did just that.

Fair-minded jurists could disagree with Adamcik's claim that the sentencing judge did not appropriately consider Adamcik's youth as required by *Miller* and *Montgomery*. Therefore, the Idaho Supreme Court's decision was not unreasonable under § 2254(d), and the Court will deny Adamcik's procedural *Miller* claim.

---

[10] Adamcik's reliance on the Supreme Court's GVRs in juvenile sentencing cases, including Justice Sotomayor's concurrence in *Adams v. Alabama*, 136 S. Ct. 1796 (2016), is misplaced. *See* Dkt. 13 at 21–22. GVRs are not clearly established Supreme Court precedent for purposes of 28 U.S.C. §§ 2254(d)(1). *See Woodall*, 572 U.S. at 419 (2014) ("Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings … of this Court's decisions.").

Adamcik also asserts a substantive *Miller* claim. That is, Adamcik contends he is not one of the rare juveniles for whom a fixed life sentence is appropriate, but is instead the more common type of juvenile killer whose crime reflects the transient immaturity of youth.

As an initial matter, the Court disagrees with Adamcik's contention that the Idaho Supreme Court failed to address his substantive *Miller* argument. *See* Dkt. 13 at 23–24. That court phrased the question before it as whether Adamcik was "one of the rare juveniles who deserved a fixed life sentence." *Adamcik II*, 708 P.3d at 488. The court went on to note the sentencing judge's finding that Adamcik was irreparably corrupt, albeit without using that "talismanic" language, and concluded that Adamcik's fixed life sentence did not violate the Eighth Amendment. *Id.* at 489. That is, the court held that the substantive component of *Miller* was satisfied because Adamcik is, indeed, one of the rare juvenile murderers for whom a fixed life sentence is appropriate. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Therefore, this Court is faced with a factual finding that Adamcik's crime did not reflect youth's transient immaturity but that, rather, Adamcik is irreparably corrupt and thus deserving of a fixed life sentence. *See* 28 U.S.C. § 2254(d)(2). This Court is bound

by that finding unless it concludes that the finding is unreasonable. The Court cannot do so.

Adamcik is correct that Dr. Corgiat's testimony was favorable to him. Dr. Corgiat began by explaining the ways in which teenage brains are not fully developed:

> And, you know, over the last several years, we've had very good, reliable, medical/scientific data largely from functional MRI studies that show that adolescent brains are not particularly developed—particularly in the precortex area—essentially, the brain or circuitry between that part of the brain and the rest of the brain doesn't fully develop until we're quite a bit older than adolescents.
>
> …
>
> So the average adolescent child possesses less than adult abilities in those areas that have to do with planning, reasoning, judgment, et cetera….
>
> They also have less capacity for regulating their emotions, and they have a tendency to be risk-taking. I think that a lot of data has shown this, you know, that risk-taking propensity—at times even trumps whatever development they have or regulating judgment.

State's Lodging A-8 at 2905–06.

Dr. Corgiat went on to discuss Adamcik's developmental characteristics in relation to the average adolescent, specifically:

> There is also evidence of variability. So, … some adolescents … do, in fact, function as well as adults in all of these areas.
>
> Of course, the variability goes in both directions, and some adolescents are certainly less mature than expected— those are the kids and young adults that who [sic] have indicators of neuropsychological and psychological testing

that showed higher level cognitive abilities, and Torey is one of those individuals.

His tests, without a doubt, show that he deviates from normal function. What we would expect sixteen, seventeen-year-old boys to do is evidenced in all of his test data. He moves in a downward direction, so he is less than age appropriate.

If you go back and look at the data that we have available, all of the school data he was diagnosed with ADHD, what they determined was a predominantly inattentive-type of ADHD—that is, unequivocally, lining of the frontal lobe immaturity. That data has been very extensive on that for years and years of research.

This means it's clear that the higher level that is, the less than developed at that level—and this child demonstrated in school that, quote, "Torey's ability to sustain attention, concentrate, and exert mental control are less well-developed."

They also said, quote, "Torey has a relative weakness in mental control that may make the process of complex information more difficult." I think they were accurate. He had an IEP, Individualized Education Plan. He had—was designated as learning disabled….

When you look at the testing from my office, it shows that same information, but this is more extensive testing. So it very clearly identifies those frontal lobe functions. Torey has a knowledge that is within normal limits—there is no question about that—but his utilization of that information in a practical way falls to the thirty-seventh percentile.

His complex attention skill is at the fiftieth percentile. The speed at which Torey is able to ingest complex information so that he has a firm understanding of it and move at the same speed that we would expect a seventeen-year-old boy to move in accumulation and utilization is at the nineteenth percentile.

His ability to apply that information with practice problems is, again, in a functional way that expresses the reality of the problem that has been placed in front of him at the eighteenth percentile.

So based on all of that, it is my opinion that Torey is intellectually less mature than we would expect a seventeen-year-old male to be with normal brain development.

*Id*. at 2907–10.

The doctor testified that he believed Adamcik was "a good candidate … for rehabilitation":

[T]his is a double-edged sword. We have a seventeen year old who has neurocognitive development that is not appropriate for his age. So that means that it we put him in adult situations, the probability that he would be able to function efficiently is poor.

But, on the other hand, we have that open door. We have a brain that isn't developed, and we have a brain that actually is at—developmental stage—younger than seventeen. So his amenability to education and training is better than it would be if he were at age seventeen level or if he was, obviously, older.

*Id*. at 2910–11. Dr. Corgiat also considered Adamcik "as a very low risk to reoffend":

There is unequivocally no evidence in mental status exam or in psychological testing that would suggest pathological drive or pathological desire that he would personally harbor, that would have led him to these offenses….

There is no evidence of sociopathy in his testing at all. There is no evidence of that lack of morality. There is evidence of an under-developed moral compass and an individual who has poor judgment and impulsivity, bad decision-making, and inappropriate responses to environmental stimuli….

*Id*. at 2913–14.

Dr. Corgiat expressed doubt that Adamcik would have committed the murder if he had been acting alone:

> I don't know why Torey did this, but I do see Torey as the kind of individual who doesn't have passion—he doesn't have a passion in any of the psychological data that would suggest that this would be something that would drive him, propel him, compel him, interest him—but he does have that immaturity.
>
> He is following ideas and not thinking about the consequences and the outcome so, as an individual, most of the time these crimes have a drive or a pathological passion associated with them. And what I'm telling you would be I'm telling you I looked for that, and it just isn't there with Torey.
>
> So, obviously, while I can't unequivocally say this isn't something he wouldn't [sic] do [acting alone], he doesn't have the kind of personality pattern that one would associate with this kind of activity.

State's Lodging A-8 at 2914–15.

But the sentencing judge was not required to agree with everything that Dr. Corgiat said, particularly given the conflicting evidence in the record with respect to Adamcik's emotional or mental control. As shown by the video, in the immediate aftermath of the murder, Draper was the emotional one. Adamcik was thinking clearly. He told Draper to "shut the fuck up" because they needed to "get [their] act straight." State's Ex. 91 at 1:27-1:30. Adamcik was not acting like a person with deficits in mental or emotional control.

Adamcik's mental control is also evidenced by the portion of the video where he and Draper are sitting at a table facing the camera. In that clip, Adamcik is the one

writing the "death list"—not Draper. *Id*. at 15:33. Indeed, throughout the video, rather than exhibiting poor emotional control, Adamcik appears calm but eager, plotting murder with chilling efficiency.

From the evidence in the record, we know that Adamcik and Draper planned the murder over several different sessions. We know that they lay in wait outside of the house—awaiting Beckham's departure so Cassie would be alone. From Adamcik's own mouth, we know that he was "horny just thinking about" their plan to kill Cassie. *Id*. at 7:47. And we know that Adamcik and Draper acted together to viciously and brutally carry out that plan, stabbing a sixteen-year-old girl thirty times.

After thoroughly reviewing the entire state court record, this Court cannot say that the Idaho Supreme Court unreasonably found that Adamcik is one of the rare juveniles whose crime reflects irreparable corruption. *See* 28 U.S.C. § 2254(d)(2). Therefore, the Court will deny Adamcik's substantive *Miller* claim.

## CONCLUSION

Sufficient evidence supports Adamcik's first-degree murder conviction, and the Idaho Supreme Court did not unconstitutionally affirm that conviction on grounds different from those charged and submitted to the jury. Further, the Idaho Supreme Court reasonably rejected Adamcik's procedural and substantive *Miller* claims. For these reasons, the Court will deny the Petition.

# ORDER

**IT IS ORDERED:**

1.     The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED, and this entire

action is DISMISSED with prejudice.

2.     The Court does not find its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

§ 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

DATED: November 25, 2019

Honorable Candy W. Dale
United States Magistrate Judge